IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Bonnett Glover Nash, | ) | C/A No.: 1:16-2478-RBH-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

I.      Relevant Background

A.      Procedural History

On July 21, 2014, Plaintiff protectively filed applications for DIB and SSI in which she alleged her disability began on July 11, 2014. Tr. at 87, 193–97, and 198–202.

Her applications were denied initially and upon reconsideration. Tr. at 101–05 and 109–13. On January 20, 2016, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Ronald Fleming. Tr. at 28–55 (Hr'g Tr.). The ALJ issued an unfavorable decision on February 11, 2016, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 11–27. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–5. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on July 8, 2016. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 55 years old at the time of the hearing. Tr. at 33. She completed high school and two years of college. Tr. at 34. Her past relevant work ("PRW") was as a childcare attendant. Tr. at 51. She alleges she has been unable to work since July 11, 2014. Tr. at 193.

2.    Medical History

On March 30, 2012, magnetic resonance imaging ("MRI") of Plaintiff's lumbar spine revealed a mild lower lumbar arthritic facet change with no evidence of spinal stenosis and minimal L4-5 disc protrusion into the left L4-5 neural foramen. Tr. at 375.

On May 1, 2013, Plaintiff presented to Gordon E. Pennebaker ("Dr. Pennebaker"), to discuss blood work. Tr. at 283. She reported problems with yeast and a boil and requested she be referred to a podiatrist. *Id.* Dr. Pennebaker refilled Plaintiff's prescription for Nexium and prescribed antifungal and antibacterial medications. *Id.*

Plaintiff presented to Daniel Skufca, M.D. ("Dr. Skufca"), for a diabetic eye examination on June 27, 2013. Tr. at 279–81. Dr. Skufca noted Plaintiff's fasting blood sugar was 140 and her hemoglobin A1c was within normal limits. Tr. at 279. Plaintiff reported decreased near and far vision. *Id.* She reported joint swelling, arm numbness, and difficulty reading as a result of blurred vision. Tr. at 279 and 280. Dr. Skufca indicated Plaintiff's best corrected visual acuity to be 20/100 in her right eye and 20/200 in her left eye. *Id.* He stated Plaintiff had poor fixation. *Id.* He diagnosed oculocutaneous albinism and classic foveal hypoplasia with resultant congenital nystagmus. Tr. at 281. He stated he was unable to offer any options that might improve Plaintiff's vision. *Id.*

Plaintiff reported she was "doing fairly well" on September 9, 2013. Tr. at 285. Lauren M. Taylor, PA-C ("Ms. Taylor"), observed Plaintiff to have "a fair amount of venostasis, particularly on the right, in the lower leg." *Id.* She indicated she would continue to monitor Plaintiff's blood pressure and would consider changing her medication to Hyzaar if her systolic measure continued to be in the 140s. *Id.* She stated she would consider adding Glipizide for diabetes if Plaintiff's hemoglobin A1c remained around seven. *Id.*

Plaintiff complained of blurred vision, lightheadedness, headache, and sinus symptoms on October 23, 2013. Tr. at 287. Ms. Taylor diagnosed acute sinusitis. *Id.*

On November 2, 2013, Plaintiff complained of continuous right flank pain that was radiating to the right upper quadrant of her abdomen. Tr. at 289. Anne B. Blake, FNP ("Ms. Blake"), indicated Plaintiff's complaints were associated with gastroesophageal

reflux disease ("GERD"). *Id.* She added a prescription for Carafate and recommended Plaintiff work on weight loss and use Nexium daily. *Id.*

Plaintiff followed up for chest discomfort on November 4, 2013. Tr. at 291. She reported that Carafate had provided no relief. *Id.* Ms. Taylor observed Plaintiff to demonstrate some tenderness to palpation in her mid-epigastric region. *Id.* She indicated she would check Plaintiff's liver function tests, amylase, and lipase and would refer her for an esophagogastroduodenoscopy ("EGD") if the test results were within normal limits. *Id.*

On November 20, 2013, an EGD showed Plaintiff to have a large hiatal hernia, esophagitis, and mild gastritis. Tr. at 329. Dr. Pennebaker indicated he would increase Plaintiff's dosage of Nexium to twice daily and would consider "working her up for any other intraabdominal etiology for her pain." *Id.*

Plaintiff reported abdominal discomfort, nausea, and diarrhea on December 4, 2013. Tr. at 294. Ms. Taylor advised Plaintiff to continue her current medications and to eat a bland diet. *Id.*

Plaintiff reported dizziness and numbness in her hands and arms on July 2, 2014. Tr. at 300. Ms. Taylor observed Plaintiff to have 1+ edema in her bilateral lower extremities. *Id.* She noted Plaintiff's pedal pulses were intact bilaterally, but that she had "some mottled appearing skin on the right lower extremity and some varicosities on the left lower extremity." *Id.* Ms. Taylor indicated they would draw and test Plaintiff's blood and let her know of any abnormalities. *Id.* She advised Plaintiff to lose weight and to modify her diet. *Id.*

On September 5, 2014, x-rays of Plaintiff's lumbar spine indicated no acute bony abnormality and maintained disc height. Tr. at 351.

Plaintiff presented to Pravin Patel, M.D. ("Dr. Patel"), for a consultative examination on October 8, 2014. Tr. at 356–60. She complained of numbness and tingling in her hands and feet as a result of diabetic neuropathy. Tr. at 356. She reported occasional dyspnea on exertion, but generally denied asthma-related problems. Tr. at 357. She complained of a dull, achy pain in her lower back that was increased by lifting, sitting, and twisting. *Id.* She also reported pain in her bilateral knees and a history of blood clots in her legs. *Id.* Dr. Patel noted Plaintiff was 5'5" tall and weighed 261 pounds. Tr. at 358. He assessed Plaintiff to have 20/100 bilateral vision with glasses. *Id.* He observed Plaintiff to have normal sensation and reflexes, good peripheral pulses, and no edema. Tr. at 359. He noted Plaintiff had normal range of motion ("ROM") in her cervical spine; 5/5 motor strength in her upper extremities; full ROM in her lumbar spine and lower extremity joints; slight tenderness and reduced ROM in her bilateral knees; a negative straight-leg raising test; and normal gait. *Id.* Dr. Patel assessed hypertension, type II diabetes with neuropathy, myopia, hyperlipidemia, lower back pain syndrome, arthralgias of the knees, hiatal hernia/GERD, asthma, sinus allergy, and morbid obesity with a body mass index ("BMI") of 42.5. Tr. at 359–60.

On October 24, 2014, state agency medical consultant William Lindler, M.D. ("Dr. Lindler"), assessed Plaintiff's physical residual functional capacity ("RFC"). Tr. at 82–85. He indicated Plaintiff had the following limitations: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about

six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; occasionally climbing ramps and stairs, balancing, stooping, kneeling, and crouching; never crawling or climbing ladders, ropes, or scaffolds; limited bilateral near and far acuity; and must avoid concentrated exposure to extreme cold, vibration, and hazards. *Id.* He stated "[a] claimant with visual acuity of 20/50 through 20/100 with no visual fields limitations would generally be expected to work with large objects and avoid common hazards in the workplace" and that jobs should be limited to those "not requiring prolonged fine visual discrimination." Tr. at 84.

Plaintiff presented to Uday Doppalapudi, M.D. ("Dr. Doppalapudi"), on November 11, 2014, to establish care. Tr. at 362. She reported feeling well with minor complaints, sleeping well, and having a good energy level. *Id.* Dr. Doppalapudi observed Plaintiff to have mild erythema in her bilateral shins and varicose veins in her bilateral lower extremities. Tr. at 364. He noted Plaintiff had been unable to tolerate Metformin. *Id.*

On December 9, 2014, Plaintiff reported she had discontinued use of Metformin because it was causing her to lose her hair and to experience stomach cramps. Tr. at 365. Dr. Doppalapudi noted the mild erythema to Plaintiff's bilateral shins was improving. Tr. at 366. He indicated he would increase Plaintiff's Glucotrol dose because she had been unable to tolerate Metformin. Tr. at 367.

Plaintiff complained of low back pain on January 6, 2015. Tr. at 368. She indicated she had misunderstood Dr. Doppalapudi's instructions and had not started

Glucotrol. *Id.* She requested refills of Losartan, Soma, and Glipizide. *Id.* Meha Minhas, M.D. ("Dr. Minhas"), noted no abnormalities on examination. Tr. at 369.

Plaintiff reported intermittent back pain on March 9, 2015. Tr. at 379. Dr. Minhas indicated Plaintiff's hypertension and hyperlipidemia were controlled and that she had lower extremity venous stasis dermatitis that was worse on the right than the left. *Id.*

On April 28, 2015, Plaintiff reported bruising on the lower part of her left leg and bilateral lower extremity edema. Tr. at 380. She indicated she had attempted to reduce her edema by elevating her legs, using compression stockings, and taking thiazide and loop diuretics. *Id.* Dr. Minhas observed Plaintiff to have abnormal pigmentation in her lower extremities. Tr. at 382. She indicated Plaintiff's hypertension was controlled and her hyperlipidemia was fairly well-controlled. *Id.*

State agency medical consultant George Walker, M.D. ("Dr. Walker"), completed a physical RFC assessment on June 10, 2015. Tr. at 95–97. He indicated Plaintiff had the following limitations: occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; and limited bilateral near and far acuity. *Id.*

Plaintiff presented to Karen Clyburn, FNP ("Ms. Clyburn"), on June 16, 2015, with a complaint of left-sided back pain. Tr. at 383. Ms. Clyburn observed Plaintiff to have a bruise on the lower part of her left leg and to have abnormal pigmentation in her bilateral lower extremities. Tr. at 385.

Plaintiff reported pain in her lower back and edema in her bilateral lower extremities on July 21, 2015. Tr. at 386. Ms. Clyburn observed trace edema and pigment changes in Plaintiff's bilateral lower extremities and a bruise on her left lower leg. Tr. at 388. She noted that Plaintiff demonstrated painful movements and decreased ROM in her spine. *Id.* She suggested that Plaintiff should elevate her legs "for at least 10 minutes every hour while awake" and use compression stockings during the day. *Id.*

Plaintiff underwent an eye examination on August 13, 2015, at Advanced Family Eye Care, LLC. Tr. at 376. The report indicates Plaintiff's best corrected visual acuity was 20/125 in her right eye and 20/150 in her left eye. *Id.*

Plaintiff reported left sided back pain on September 15, 2015. Tr. at 389. Ms. Clyburn observed Plaintiff to have a bruise on her left lower leg and trace edema and changes in pigment in her bilateral lower extremities. Tr. at 390. She indicated Plaintiff demonstrated painful movement and decreased ROM of her spine. *Id.*

On October 13, 2015, Plaintiff reported intermittent back pain and pain in the joints of her shoulders and legs. Tr. at 393. Ms. Clyburn noted Plaintiff had trace bilateral edema, a bruise to her lower left leg, and pigmented bilateral lower extremities. Tr. at 394. She indicated Plaintiff complained of painful movements and demonstrated decreased ROM in her spine. *Id.* Plaintiff reported painful bilateral shoulder movement, and Ms. Clyburn observed her shoulders to be mildly tender. *Id.*

On October 26, 2015, Plaintiff reported pain and numbness in her bilateral legs, pain in her shoulders, cough, and congestion. Tr. at 395. Ms. Clyburn observed Plaintiff to have mildly tender frontal sinuses, mild pharyngeal erythema, a bruise on the left

lower leg and trace edema and pigment changes in her bilateral lower extremities. Tr. at 397. She indicated Plaintiff had painful spinal movements and decreased ROM. *Id.* She noted Plaintiff's bilateral shoulders were mildly tender and that she demonstrated painful shoulder movement. *Id.* She discontinued Flexeril and prescribed Skelaxin for lumbago and Neurontin for diabetic neuropathy. *Id.* She again noted that Plaintiff should "elevate legs for at least 10 minutes every hour while awake" and use compression stockings during the day for edema. *Id.*

Plaintiff followed up with Dr. Skufca on January 5, 2016. Tr. at 408. Dr. Skufca indicated Plaintiff's best corrected final visual acuity was 20/100 in her right eye and 20/100-1 in her left eye. *Id.* He stated Plaintiff's confrontation visual field was impaired in all directions. *Id.* He indicated Plaintiff was legally blind and had impaired depth perception and limited function of peripheral vision. Tr. at 410. He provided an updated prescription for glasses. *Id.*

Plaintiff endorsed left sided back pain, shoulder pain, and sinus congestion on January 11, 2016. Tr. at 417. Ms. Clyburn observed Plaintiff to have nasal congestion and to be tender in her bilateral sinuses. Tr. at 419. She noted Plaintiff had decreased bilateral shoulder ROM and reported pain with movement. *Id.*

Dr. Skufca provided a medical source statement regarding Plaintiff's visual impairment on January 13, 2016. Tr. at 415–16.

On February 3, 2016, x-rays of Plaintiff's bilateral shoulders showed early degenerative arthritic changes, but no soft tissue calcifications. Tr. at 426–27.

C. The Administrative Proceedings

1. The Administrative Hearing

a. Plaintiff's Testimony

At the hearing on January 20, 2016, Plaintiff testified she was 5'5" tall and weighed 260 pounds. Tr. at 33. She indicated she had been employed from 2001 until July 11, 2014, as a childcare attendant at Camden First Baptist Church. Tr. at 35. She stated she stopped working because she was experiencing pain in her back and swelling in her legs and feet. Tr. at 43.

Plaintiff endorsed lower back pain that was exacerbated by walking, standing, and sitting "for a period of time." Tr. at 36. She described the pain as a nine on a 10-point scale and indicated it presented daily. *Id.* She stated she took Gabapentin, Ibuprofen, and Tramadol for her pain. *Id.* She reported that the Gabapentin caused her to experience dizziness and lightheadedness. Tr. at 37. She indicated her doctors had not recommended she undergo surgery. *Id.*

Plaintiff endorsed problems with her vision. *Id.* She stated she experienced blurred vision when she attempted to read small print. *Id.* She indicated her depth perception was affected by her vision problems. Tr. at 44. She stated her eyes would water if she read, stared at something for a long period, or was exposed to the sun. Tr. at 48. She indicated she did not often watch television because of her vision problems. *Id.* She stated she was able to read a computer screen for no longer than 15 minutes at a time. *Id.*

Plaintiff testified she used oral medication to treat diabetes. Tr. at 39. She indicated her blood glucose was often elevated. *Id.* She stated she had discontinued use of Metformin because it caused sharp abdominal pain and diarrhea. Tr. at 46.

Plaintiff reported daily swelling in her feet and legs as a result of venous stasis. Tr. at 40. She indicated the swelling in her lower extremities was accompanied by discoloration, soreness, and pain. Tr. at 44. She stated she used Furosemide and often elevated her feet at waist-level throughout the day. Tr. at 40 and 49. She noted that her doctor had advised her to elevate her legs for 10 minutes each hour. Tr. at 44.

Plaintiff indicated Gabapentin did "[v]ery little" to relieve the neuropathy in her legs and feet. Tr. at 40. She stated her inhalers were effective in treating her asthma symptoms. *Id.*

Plaintiff testified she could sit for 35 to 40 minutes, stand for 25 to 30 minutes, and walk for 20 minutes at a slow pace. Tr. at 41. She estimated she was able to lift up to 15 pounds. *Id.* She endorsed some difficulty with bending to retrieve items from the floor, kneeling, and crawling. *Id.*

Plaintiff testified she did not have a driver's license because her vision problems prevented her from passing the test. Tr. at 34. She indicated she was able to read a large print Bible for a short period. Tr. at 39. She stated she engaged in personal care activities without assistance. Tr. at 41. She endorsed abilities to wash dishes, cook once a week, make her bed, and vacuum and wash laundry with frequent breaks. Tr. at 41–42 and 43. She indicated she went shopping for groceries twice a month. Tr. at 42. She reported she

attended church and a Bible study on Tuesday evenings. Tr. at 42 and 43. She indicated she had enjoyed sewing, but was no longer able to thread a needle. Tr. at 49.

b.      Vocational Expert Testimony

Vocational Expert ("VE") Carey A. Washington, Ph. D., reviewed the record and testified at the hearing. Tr. at 50–54. The VE categorized Plaintiff's PRW as a childcare attendant, *Dictionary of Occupational Titles* ("*DOT*") number 359.677-010, as medium with a specific vocational preparation of three. Tr. at 51. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform medium work with frequent balancing and climbing of ramps or stairs; could engage in no driving, kneeling, crouching, crawling, or climbing ladders, ropes, or scaffolds; could engage in occasional stooping; could perform no jobs requiring full field of vision, acute or precise depth perception, or prolonged fine visual discrimination; and must avoid concentrated exposure to extreme cold, vibration, machinery, and heights. Tr. at 51 and 52. The VE testified that the hypothetical individual would be unable to perform Plaintiff's PRW. Tr. at 51. The ALJ asked whether there were any other jobs in the regional or national economy that the hypothetical person could perform. *Id.* The VE identified medium, unskilled jobs as a sandwich maker, *DOT* number 317.664-010, with 150,000 positions in the national economy; a linen-room attendant, *DOT* number 222.387-030, with 125,000 positions in the national economy; and a kitchen helper, *DOT* number 318.687-010, with 125,000 positions in the national economy. Tr. at 52.

The ALJ next asked the VE to consider an individual of Plaintiff's vocational profile who was limited to light work with the additional limitations set forth in the first

hypothetical question. *Id.* The VE stated the individual could perform light, unskilled jobs as a ticket seller, *DOT* number 211.467-030, with 125,000 positions in the national economy; a ticket taker, *DOT* number 344.667-010, with 100,000 positions in the national economy; and an office helper, *DOT* number 239.567-010, with 100,000 positions in the national economy. Tr. at 52–53.

For a third hypothetical question, the ALJ asked the VE to consider an individual of Plaintiff's vocational profile with the same limitations in the first hypothetical question, but to further assume the individual would be limited to sedentary work and would be off task for 20% of the workday. Tr. at 53. He asked if there were jobs the individual could perform. *Id.* The VE indicated the individual would be unable to perform any substantial work. *Id.*

Plaintiff's attorney asked the VE to consider the limitations in the ALJ's second hypothetical question, but to further assume the individual would be unable to perform any work activities that required near acuity, far acuity, accommodation for vision, and depth perception. *Id.* He asked if the additional limitations would affect the jobs the individual could perform. Tr. at 53–54. The VE indicated the additional limitations would reduce the number of jobs identified in response to the second hypothetical question by at least 30%. Tr. at 54.

Plaintiff's attorney asked the VE to consider a hypothetical individual who was limited as described in the ALJ's second hypothetical question, but would be expected to be off task for 15% of the workday. *Id.* He asked if the individual would be able to

perform any work. *Id.* The VE testified that the individual would be unable to perform any work. *Id.*

## 2. The ALJ's Findings

In his decision dated February 19, 2016, the ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2018.
2. The claimant has not engaged in substantial gainful activity since July 11, 2014, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
3. The claimant has the following severe impairments: decreased vision secondary to oculocutaneous albinism; obesity; and degenerative disc disease of the lumbar spine (20 CFR 404.1520(c) and 416.920(c)).
4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except for the following limitations: no more than frequent climbing of ramps or stairs; no climbing of ladders, ropes, or scaffolds; no more than frequent balancing; no more than occasional stooping; no kneeling, crouching, or crawling; no jobs requiring full field of vision, acute or precise depth perception, or prolonged fine visual discrimination; avoidance of concentrated exposure to extreme cold, vibration, machinery, and heights; and no driving jobs.
6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).
7. The claimant was born on February 12, 1960 and was 54 years old, which is defined as an individual closely approaching advanced age on the alleged disability onset date. The claimant subsequently changed age category to advanced age (20 CFR 404.1563 and 416.963).
8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).
9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as framework supports a finding that the claimant is "not disabled," whether or not the claimant has

transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from July 11, 2014, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 16–23.

II.     Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)      the ALJ erred in assessing Plaintiff's severe impairments at step two;

2)      the ALJ did not adequately weigh the opinion evidence of record;

3)      the ALJ's RFC assessment is not supported by substantial evidence; and

4)      the Commissioner failed to meet her burden at step five.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.      Legal Framework

1.      The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[1] (4) whether such impairment prevents claimant from performing PRW;[2] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520 and § 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) and § 416.920(a)(4)

[1] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525 and § 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii) and § 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526 and § 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[2] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

(providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b) and § 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the

Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.     Analysis

1.     Step Two Findings

Plaintiff argues the ALJ did not properly assess the severity of her impairments at step two. [ECF No. 15 at 8]. She maintains that the ALJ did not explain his finding that venous stasis dermatitis was a non-severe impairment and that the record showed that the impairment caused functional limitations. *Id.* at 9. She further contends the ALJ

18

neglected to mention or assess the functional limitations that were imposed by degenerative joint disease in her bilateral shoulders. *Id.* at 9.

The Commissioner argues the ALJ explained his reasons for concluding that venous stasis dermatitis was a non-severe impairment. [ECF No. 17 at 10–11]. She maintains that ample evidence in the record supports the ALJ's finding. *Id.* at 11. She contends the record did not demonstrate that the degenerative joint disease in Plaintiff's shoulders imposed any functional limitations. *Id.* at 12.

A severe impairment "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c) and § 416.920(c); *see also* SSR 96-3p. A non-severe impairment "must be a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities." SSR 96-3p, citing SSR 85-28; *see also* 20 C.F.R. § 404.1521(a) and § 416.921(a) ("An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.[3]").

The ALJ's recognition of a single severe impairment at step two ensures that he will progress to step three. *See Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) ("[A]ny error here became harmless when the ALJ reached the proper conclusion that [claimant] could not be denied benefits conclusively at step two and proceeded to the

---

[3] Basic work activities include physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; capacities for seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, coworkers, and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(b) and § 416.921(b).

next step of the evaluation sequence."). Therefore, this court has found no reversible error where the ALJ neglected to find an impairment to be severe at step two provided that he considered that impairment in subsequent steps. *See Washington v. Astrue*, 698 F. Supp. 2d 562, 580 (D.S.C. 2010) (collecting cases); *Singleton v. Astrue*, No. 9:08-1982-CMC, 2009 WL 1942191, at *3 (D.S.C. July 2, 2009).

The ALJ found that Plaintiff's severe impairments included "decreased vision secondary to oculocutaneous albinism; obesity; and degenerative disc disease of the lumbar spine." Tr. at 16.

The evidence of record arguably suggests that venous stasis dermatitis and bilateral shoulder osteoarthritis imposed limitations that reduced Plaintiff's ability to perform basic work activities. Plaintiff reported bilateral shoulder pain to Ms. Clyburn during at least three treatment visits. Tr. at 393, 395, and 417. Ms. Clyburn observed Plaintiff to demonstrate tenderness and painful and painful, reduced bilateral shoulder ROM. Tr. at 394, 397, and 419. An x-ray confirmed that Plaintiff had mild degenerative arthritis. Tr. at 426–27.

Plaintiff complained of lower extremity edema during multiple treatment visits with Ms. Taylor, Dr. Minhas, and Ms. Clyburn. Tr. at 300, 380, 386, 389, 393, and 395. She testified that she experienced daily swelling, discoloration, soreness, and pain in her feet and legs as a result of venous stasis and indicated a need to elevate her legs to reduce her symptoms. Tr. at 40 and 44. Plaintiff's providers observed her to have symptoms that were consistent with venous stasis dermatitis, including 1+ or trace edema, mottled skin, varicosities, and changes in pigment in her lower extremities. Tr. at 300, 382, 388, 390,

394, and 397. Her treating nurse practitioner advised her to elevate her legs for 10 minutes per hour and to wear compression stockings in order to reduce edema. Tr. at 388 and 397.

The ALJ did not address bilateral shoulder osteoarthritis in discussing Plaintiff's severe and non-severe impairments. He determined venous stasis dermatitis with pedal edema was a non-severe impairment. Tr. at 417. He found that all of the impairments that he classified as non-severe were "well managed with appropriate care and treatment and/or fail[ed] to produce more than a minimal effect on the claimant's ability to perform basic work activities." *Id.* He later stated "[c]oncerning the claimant's aforementioned non-severe impairments, nothing in the medical evidence of record notes that these impairments cause any type of functional limitation." Tr. at 20.

Because the evidence of record suggested that venous stasis dermatitis and bilateral shoulder osteoarthritis affected Plaintiff's ability to perform basic work activities, the ALJ should have explicitly considered both impairments at step two. The ALJ's error at step two might have been remedied if he had considered Plaintiff's bilateral shoulder osteoarthritis and venous stasis dermatitis in subsequent steps. *See Washington*, 698 F. Supp. 2d at 580; *Singleton*, 2009 WL 1942191, at *3. However, a review of the ALJ's decision as a whole shows no recognition of the impairment of bilateral shoulder osteoarthritis or any limitations the impairment might impose on Plaintiff's RFC. The ALJ specifically found that none of Plaintiff's non-severe impairments, including venous stasis dermatitis, imposed any functional limitations (Tr. at 20), but he failed to address evidence to the contrary. In light of the foregoing, the

undersigned recommends the court find that the ALJ failed to remedy his step two error in subsequent steps.

### 2.     Evaluation of Opinion Evidence

Plaintiff argues the ALJ did not adequately weigh opinions from Ms. Clyburn and Dr. Skufca. [ECF NO. 15 at 13]. The Commissioner maintains the ALJ properly evaluated the medical opinion evidence. [ECF No. 17 at 16].

ALJs must consider all medical opinions of record. 20 C.F.R. § 404.1527(b) and § 416.927(b). "Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527(a)(1) and § 416.927(a)(1). Acceptable medical sources include licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. SSR 06-03p; 20 C.F.R. § 404.1513(a) and § 416.913(a).

The regulations require that ALJs accord controlling weight to treating physicians' medical opinions that are well-supported by medically-acceptable clinical and laboratory diagnostic techniques and that are not inconsistent with the other substantial evidence of record. 20 C.F.R. § 404.1527(c)(2) and § 416.927(c)(2); SSR 96-2p.

If the record contains no opinion from a treating physician or if the ALJ determines that the treating physician's opinion is not entitled to controlling weight, he is required to evaluate all medical opinions of record based on the factors in 20 C.F.R. § 404.1527(c) and § 416.927(c). Those factors include (1) the examining relationship

between the claimant and the medical provider; (2) the treatment relationship between the claimant and the medical provider, including the length of the treatment relationship and frequency of treatment and the nature and extent of the treatment relationship; (3) the supportability of the medical provider's opinion in his treatment records; (4) the consistency of the medical opinion with other evidence in the record; (5) the specialization of the medical provider offering the opinion; and (6) any other relevant factors that tend to support or detract from the opinion. *Johnson*, 434 F.3d at 654; 20 C.F.R. § 404.1527(c) and § 416.927(c). ALJs are not required to expressly discuss each factor in 20 C.F.R. § 404.1527(c) and § 416.927(c), but their decisions should demonstrate that they considered and applied all the factors and accorded each opinion appropriate weight in light of the evidence of record. *See Hendrix v. Astrue*, No. 1:09-1283-HFF, 2010 WL 3448624, at *3 (D.S.C. Sept. 1, 2010).

Other sources, including nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, therapists, educational personnel, social welfare agency personnel, rehabilitation counselors, spouses, other relatives, friends, neighbors, clergy, and former coworkers and employers, may offer opinions, as well. *See* 20 C.F.R. § 404.1513(d) and § 416.913(d). Although ALJs are not required to evaluate these sources' opinions as stringently as opinions from acceptable medical sources, they should be guided by the basic principles outlined in 20 C.F.R. § 404.1527 and § 416.927 in considering them. SSR 06-03p.

"An ALJ's determination as to the weight to be assigned to a medical opinion generally will not be disturbed absent some indication that the ALJ has dredged up

'specious inconsistencies," *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992), or has failed to give a sufficient reason for the weight afforded a particular opinion." *Dunn v. Colvin*, 607 F. App'x 264, 267 (4th Cir. 2015), citing 20 C.F.R. § 404.1527(d).

In view of the aforementioned authority, the undersigned examines the ALJ's consideration of Ms. Clyburn's and Dr. Skufca's opinions.

### a. Ms. Clyburn's Opinion

During two treatment visits, Ms. Clyburn advised Plaintiff to elevate her legs for at least 10 minutes each hour while awake to reduce lower extremity edema. Tr. at 388 and 397.

Plaintiff argues the ALJ failed to explain how he weighed Ms. Clyburn's opinion. [ECF No. 15 at 13]. The Commissioner maintains Ms. Clyburn's recommendation that Plaintiff elevate her legs appeared in only two treatment notes and was a short-term recommendation, as opposed to a restriction she intended to impose for a continuous period of 12 months or more. [ECF No. 17 at 11, 18–19].

Ms. Clyburn addressed Plaintiff's physical restrictions, and her statement would have been considered a medical opinion if she were an acceptable medical source, as opposed to a nurse practitioner. *See* 20 C.F.R. §§ 404.1527(a)(1), 404.1513(a), 416.913(a), and 416.927(a)(1). Although the restriction Ms. Clyburn imposed did not meet the regulatory definition for a medical opinion, the ALJ was still required to consider it. *See* SSR 06-03p ("Opinions from these medical sources, who are not technically deemed 'acceptable medical sources' under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects,

along with the other relevant evidence in the file."). However, a review of the ALJ's decision yields no reference to Ms. Clyburn's statement.

The undersigned rejects the Commissioner's argument that Ms. Clyburn did not indicate a restriction that was expected to last for a period of 12 months or more. As Plaintiff points out (ECF No. 18 at 1), "the principles of agency law limit this Court's ability to affirm based on *post hoc* rationalizations by the Commissioner's lawyers." *Robinson ex rel. M.R. v. Comm'r of Soc. Sec.*, No. 0:07-3521-GRA, 2009 WL 708267, at *12 (D.S.C. 2009). "[R]egardless [of] whether there is enough evidence in the record to support the ALJ's decision, principles of administrative law require the ALJ to rationally articulate the grounds for [his] decision and confine our review to the reasons supplied by the ALJ." *Id.*, citing *Steele v. Barnhart*, 290 F.3d 936, 841 (7th Cir. 2002). Where, as here, the ALJ failed to acknowledge and consequently provided no reason for rejecting Ms. Clyburn's opinion, the undersigned recommends the court find his decision to be unsupported by substantial evidence.

b.    Mr. Skufca's Opinion

In his medical source statement, Dr. Skufca indicated he based his opinion on examination findings on June 27, 2013, and January 5, 2016. Tr. at 415. He stated Plaintiff's diagnoses included oculocutaneous albinism with congenital nystagmus and macular aplasia in both eyes. *Id.* He indicated Plaintiff's best corrected visual acuity was 20/100 in her right eye and 20/100–1 in her left eye. *Id.* He stated that Plaintiff's visual field was constricted and limited to the center only and that her vision was poor. *Id.* He indicated Plaintiff had "no depth perception" and did "not see well for any activities." *Id.*

Dr. Skufca indicated Plaintiff could never engage in work activities that involved depth perception and could rarely engage in work activities that required near acuity, far acuity, accommodation, and field of vision. Tr. at 416. He noted Plaintiff could never climb ladders. *Id.* He stated Plaintiff was unable to drive or operate machinery and could not work at heights because she presented "a fall risk." *Id.*

Plaintiff maintains that although the ALJ purported to give full weight to Dr. Skufca's opinions, his RFC assessment did not adequately account for the restrictions Dr. Skufca indicated. [ECF No. 15 at 13]. The Commissioner argues the ALJ explained that he gave great weight to Dr. Skufca's opinion and incorporated the majority of the limitations he imposed in the RFC assessment. [ECF No. 17 at 17].

The ALJ's RFC assessment includes the following restrictions that Dr. Skufca indicated in his statement: no climbing of ladders; avoidance of machinery and heights; no driving; and no jobs requiring full field of vision, acute or precise depth perception, or prolonged fine visual discrimination. *Compare* Tr. at 17, *with* Tr. at 415–16. He included an additional restriction for "no jobs requiring . . . prolonged fine visual discrimination."[4] Tr. at 17. However, he did not include the restrictions Dr. Skufca suggested for no peripheral vision, rare near acuity, rare far acuity, and rare accommodation. *Compare* Tr. at 17, *with* Tr. at 415–16.

---

[4] The *DOT* does not specifically address "prolonged fine visual discrimination" in such a term. It addresses the following visual requirements: near acuity, far acuity, depth perception, accommodation, color vision, and field of vision. *See generally* 317.664-010 SANDWICH MAKER. *Dictionary of Occupational Titles* (4th ed., revised 1991), 1991 WL 672749; 222.387-030. LINEN-ROOM ATTENDANT. *Dictionary of Occupational Titles* (4th ed., revised 1991), 1991 WL 672098; 318.687-010. KITCHEN HELPER. *Dictionary of Occupational Titles* (4th ed., revised 1991), 1991 WL 672755.

The ALJ stated that recent records indicated Plaintiff's vision was "correctable to 20/100, and although the claimant has less than full field of vision and decreased depth perception, which has been accounted for above, nothing in the medical evidence indicates that she is totally blind or incapable of work with large objects." Tr. at 20. He indicated Plaintiff's report that she read her Bible daily suggested her "vision capability" was consistent with the RFC assessment. *Id.* He found that the medical evidence was "generally consistent with" Dr. Skufca's medical source statement. Tr. at 21. He stated he had "incorporated the majority of the limitations outlined by Dr. Skufca" in the RFC assessment. *Id.* He further indicated "insofar as it is consistent with the findings made herein," Dr. Skufca's medical source statement was "of great evidentiary weight." *Id.*

The Commissioner argues that even though he gave it great evidentiary weight, the ALJ was not required to accept Dr. Skufca's opinion in its entirety and was free to credit those portions of the opinion that were consistent with the evidence and to discredit those portions that were not. [ECF No. 17 at 17]. The undersigned has reviewed the cases cited by the Commissioner and agrees that several courts have recognized that an ALJ is not required to adopt every limitation in a medical source opinion to which he purports to give great or significant weight as a whole. *See Bacnik v. Colvin*, 2014 WL 3547387, at *4 n.7 (M.D.N.C. July 17, 2014); *Wilkinson v. Comm. of Soc. Sec.*, 2014 WL 840925, at *3 (3d Cir. Mar. 5, 2014); *Lambert-Newsome v. Astrue*, 2012 WL 2922717, at *6 (S.D. Ill. July 17, 2012); *Woodrome v. Astrue*, 2012 WL 1657126, at *3 (W.D. Mo. May 10, 2012); *Irving v. Astrue*, 2012 WL 870845, at *2–3 (C.D. Cal. Mar. 14, 2012). However, the undersigned notes that the cited cases are not binding on this court. Furthermore, even

if an ALJ is not required to adopt every functional limitation in a medical opinion to which he assigns great weight, he has a duty to provide "specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record" and his explanation "must be sufficiently specific to make clear to any subsequent reviewers the weight [he] gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p. This court has interpreted SSR 96-2p to require that an ALJ explain his reasons for declining to adopt particular limitations in a medical opinion that he generally found to be "in accordance with the evidence." *Alexander v. Colvin*, No. 1:12-2615-JMC, 2014 WL 526333, at *13 (D.S.C. Feb. 10, 2014) ("Because the ALJ failed to incorporate all of the physical limitations opined by Dr. Landry into the RFC, he necessarily discounted those opinions despite his clear statement to the contrary. Furthermore, because the ALJ failed to explain why he discounted the physical limitation opinions, the undersigned is constrained to recommend a finding that the ALJ's decision to discount Dr. Landry's opinion is not supported by substantial evidence.").

In the instant case, the ALJ did not provide any reason for declining to adopt the additional restrictions Dr. Skufca indicated. Although he stated the evidence suggested Plaintiff was capable of reading her Bible daily and was not "totally blind or incapable of work with large objects" (Tr. at 20), he did not address her capacities with respect to peripheral vision, near acuity, far acuity, or accommodation. In the absence of an explanation, it is unclear from the record whether the ALJ consciously rejected the additional visual restrictions or merely forgot to include them in the RFC assessment. In light of the foregoing, the undersigned recommends the court find the ALJ did not

consider Dr. Skufca's opinion in accordance with the provisions of 20 C.F.R. § 404.1527 and § 416.927 and SSR 96-2p.

The Commissioner argues the additional visual limitations were inconsequential in light of the VE's testimony that an individual with such limitations could perform a reduced number of the identified jobs. [ECF No. 17 at 18]. However, the undersigned notes that the VE's testimony deviated from the *DOT* with respect to the reduction in the number of jobs as a result of the additional visual limitations. *See* Tr. at 53–54. Therefore, the ALJ would have had to resolve the inconsistency between the vocational sources in order for the VE's testimony to support a finding that a substantial number of jobs existed that Plaintiff could perform with the additional visual limitations. *See* SSR 00-4p ("When vocational evidence provided by a VE . . . is not consistent with information in the *DOT*, the adjudicator must resolve this conflict before relying on the VE . . . to support a determination or decision that the individual is or is not disabled. The adjudicator will explain in the determination or decision how he or she resolved the conflict."). Because the ALJ did not include the additional visual limitations in the RFC assessment, he relied only on that portion of the VE's testimony that was consistent with the *DOT* and, consequently, did not resolve the conflict between the *DOT* and the VE's testimony regarding the effect of the additional visual restrictions. *See* Tr. at 23 ("Pursuant to SSR 00-4p, the undersigned has determined that the vocational expert's testimony is consistent with the information contained in the *Dictionary of Occupational Titles*.").

3.     RFC Assessment

Plaintiff argues that substantial evidence does not support the ALJ's RFC assessment. [ECF No. 15 at 10]. She maintains that the ALJ did not reconcile his finding that she could stand and walk for eight hours with evidence in the record that suggested she needed to elevate her legs. *Id.* at 11. She contends the ALJ failed to consider the effect of her shoulder impairment and degenerative disc disease on her RFC. *Id.* at 11. She claims the ALJ did not explain his findings with respect to "key functions of the RFC." *Id.* at 11.

The Commissioner argues the ALJ included all of Plaintiff's credibly-established functional limitations in the RFC assessment. [ECF No. 17 at 13]. She maintains the ALJ noted that the objective medical evidence showed Plaintiff's symptoms to wax and wane in intensity and to generally support a finding that she could perform a modified range of medium work. *Id.* at 14–15. She contends the ALJ's RFC assessment was consistent with Plaintiff's ADLs. *Id.* at 15.

To adequately assess an individual's RFC, the ALJ must determine the limitations imposed by her impairments and how those limitations affect her ability to perform work-related physical and mental abilities on a regular and continuing basis. SSR 96-8p. The ALJ should consider all the claimant's allegations of physical and mental limitations and restrictions, including those that result from severe and non-severe impairments. *Id.* "The RFC assessment must include a narrative discussion describing how all the relevant evidence in the case record supports each conclusion and must cite specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)."

*Id.* The ALJ must also consider and explain how any material inconsistencies or ambiguities in the record were resolved. *Id.* "The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.* "[R]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015), citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013).

In light of the above recommendations, the undersigned recommends the court find the ALJ did not adequately assess the functional effects of venous stasis dermatitis, bilateral shoulder osteoarthritis, and oculocutaneous albinism and classic foveal hypoplasia with resultant congenital nystagmus. In addition, though the ALJ found degenerative disc disease of the lumbar spine to be among Plaintiff's severe impairments, he did not explain how he accounted for the impairment in the RFC assessment. Therefore, ALJ neglected to assess Plaintiff's "capacity to perform relevant functions, despite contradictory evidence in the record," *Mascio*, 780 F.3d at 636, and he should reconsider Plaintiff's RFC on remand.

### 4.    Commissioner's Burden at Step Five

Plaintiff argues the ALJ did not meet the Commissioner's burden at step five to show that she could perform a significant number of jobs with the restrictions in the RFC assessment. [ECF No. 15 at 14]. She maintains that a review of the *DOT* reveals conflicts

between its descriptions of the jobs the VE identified and the RFC the ALJ assessed. *Id.* at 14–16.

The Commissioner argues the *DOT*'s descriptions of the jobs show that they could be performed by an individual with the visual limitations included in the ALJ's RFC assessment. [ECF No. 17 at 21]. She contends the *DOT* describes the job of sandwich maker as requiring no far acuity, no depth perception, and no field of vision; the job of linen-room attendant as requiring no far acuity, depth perception, accommodation, or field of vision; and the job of kitchen helper as requiring no near acuity, far acuity, depth perception, accommodation, or field of vision. *Id.* at 21–22.

At step five of the sequential evaluation process, the Commissioner bears the burden of showing that the economy contains a significant number of jobs that the claimant can perform. *Walls*, 296 F.3d at 290. Generally, an ALJ should look to the *DOT* as the primary source in determining whether jobs exist that an individual with the claimant's limitations may perform. 20 C.F.R. § 404.1566(d) and 416.966(d); *see also* SSR 00-4p ("[W]e rely primarily on the *DOT* (including its companion publication, the *SCO*) for information about the requirements of work in the national economy"). To produce specific vocational evidence showing that the national economy provides employment opportunities, it is often necessary for the ALJ to solicit the services of a VE. *See Walker*, 889 F.2d at 50; *see also Aistrop*, 36 F. App'x at 147 (providing that where a claimant has both exertional and nonexertional impairments that prevent performance of a full range of work at a given exertional level, "the Commissioner must

prove through expert vocational testimony that jobs exist in the national economy which the claimant can perform").

For the ALJ to rely on the VE's opinion, "it must be based upon a consideration of all other evidence in the record . . . and it must be in response to proper hypothetical questions which fairly set out all of [a] claimant's impairments." *Johnson*, 434 F.3d at 659 (quoting *Walker*, 889 F.2d at 50); *see also English v. Shalala*, 10 F.3d 1080, 1085 (4th Cir. 1993). A VE's testimony cannot constitute substantial evidence in support of the Commissioner's decision if the hypothesis fails to conform to the facts. *See id.*

Occupational information from VE's should generally be consistent with the *DOT*. SSR 00-4p. However, when there is an apparent unresolved conflict between the *DOT* and the information provided by the VE, the ALJ "must elicit a reasonable explanation for the conflict before relying on the VE's opinion to support a determination. *Id.* The ALJ must inquire on the record as to whether the VE's testimony is consistent with the *DOT* as part of her duty to fully develop the record. *Id.* She must also "elicit a reasonable explanation for" and "resolve conflicts" between the VE's testimony and the *DOT*. *Id.* In *Pearson v. Colvin*, 810 F.3d 204 (4th Cir. 2015), the court emphasized the ALJ's affirmative duty to question a VE regarding apparent conflicts with the *DOT*. The court indicated ALJs are required "to make an independent identification of conflicts" and stated "[a]n ALJ has not fully developed the record if it contains an unresolved conflict between the expert's testimony and the *Dictionary*." *Id.* at 210.

A review of the *DOT*'s description of the jobs reveals no conflict between the visual limitations the ALJ assessed in the RFC and the visual limitations indicated in the

*DOT*.[5] Compare Tr. at 17, with 317.664-010 SANDWICH MAKER. *Dictionary of Occupational Titles* (4th ed., revised 1991), 1991 WL 672749; 222.387-030. LINEN-ROOM ATTENDANT. *Dictionary of Occupational Titles* (4th ed., revised 1991), 1991 WL 672098; and 318.687-010. KITCHEN HELPER. *Dictionary of Occupational Titles* (4th ed., revised 1991), 1991 WL 672755. However, because the hypothetical question the ALJ posited to the VE did not reflect an RFC that was based on his consideration of the entire record, the VE's testimony cannot serve as substantial evidence to support the existence of jobs Plaintiff could perform. *See Johnson*, 434 F.3d at 659; *Walker*, 889 F.2d at 50; *English*, 10 F.3d at 1085. In light of the foregoing, the undersigned recommends the court find the Commissioner did not meet her burden at step five.

III.     Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of

---

[5] Plaintiff has not alleged conflicts other than those with respect to visual limitations, but the undersigned's review shows a conflict between the *DOT*'s description of the job of kitchen helper and the assessed RFC in that the RFC provided for occasional stooping and no crouching, but the position is described as requiring frequent stooping and crouching. Compare Tr. at 17, with 318.687-010. KITCHEN HELPER. *Dictionary of Occupational Titles* (4th ed., revised 1991), 1991 WL 672755.

42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

*Shiva V. Hodges*

April 27, 2017
Columbia, South Carolina

Shiva V. Hodges
United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).